282 So.2d 819 (1973)
Roger Lee LaFLEUR et al.
v.
BOYCE MACHINERY CORPORATION.
No. 9460.
Court of Appeal of Louisiana, First Circuit.
August 22, 1973.
Rehearing Denied September 26, 1973.
Writs Granted November 9, 1973.
*820 Gordon A. Pugh, Breazeale, Sachse & Wilson, and John B. Noland, Breazeale, Sachse & Wilson, Baton Rouge, for appellant.
Donald Soileau, Mamou, for appellees.
Before LANDRY, TUCKER and PICKETT, JJ.
LANDRY, Judge.
Defendant (Boyce) appeals a judgment in favor of plaintiff, LaFleur and his associate, Percy Fontenot (Appellees), decreeing rescission of the sale of a used D-7E Caterpillar Tractor for alleged vices and defects rendering the machine unsuitable for its intended purpose, namely, heavy land clearing involving the felling of trees, removal of stumps and related activities. The lower court found the machine defective in that it could not be put to sustained use due to engine overheating. Based on said finding, the court below entered judgment as follows: (1) Ordering return of the machine to Boyce and repayment by Boyce to Appellees of the $32,130.00 purchase price; (2) in favor of Appellees against Boyce for $1,724.86 paid for repairs to the machine during its use by Appellees; (3) in favor of Boyce as plaintiff in reconvention against LaFleur and Fontenot on unrelated open accounts in the sum of $790.15 and $1,130.00, respectively, and (4) in favor of Boyce rejecting Appellees' claims for alleged loss of profits and attorney's fees.
Boyce maintains the lower court erred in concluding the machine overheated because of vices and defects rather than due to improper maintenance as alleged by Boyce and reputedly established by the record. Alternatively, Boyce contends Appellees' remedy should be limited to reduction in the purchase price because Appellees caused extensive repairs (a complete engine overhaul) to be performed on the machine after institution of this action, thus making it impossible for Appellees to restore *821 the status quo. Appellees have answered the appeal reurging their rejected claims for lost profits and attorney's fees. We reverse the judgment ordering rescission, return of the machine to Boyce, and return of the purchase price to Appellees. We affirm the judgments rendered on Boyce's reconventional demands on unrelated open account. We affirm the judgment in Appellees' favor for repairs made to the machine by the vendor, and also affirm the judgment rejecting Appellees' demands for alleged lost profits and attorney's fees. We concur in the finding that the machine was defective, but reverse the trial court's judgment ordering rescission, and render judgment ordering a reduction in price because of purchaser's inability to restore the status quo, and remand this matter to the trial court for determination of the amount of reduction due Appellees. In all other respects, we affirm the judgment below.
The parties are in agreement that the following rules of law pertain herein: All sales contain an implied warranty that the object thereof is free of redhibitory vices and defects and, unless such warranty is waived, the seller warrants the thing sold as being fit for its intended purpose and use. Lee v. Blanchard, La.App., 264 So.2d 364, and cases therein cited.
Redhibition is the avoidance of a sale on account of a vice or defect in the thing sold which renders it either absolutely useless, or its use so inconvenient and imperfect, it may be presumed the buyer would not have purchased it had he known of the defects. Lee v. Blanchard, above.
In an action to avoid a sale for redhibition of a complicated piece of machinery, it is not necessary that the buyer establish the precise cause which renders the object unsuitable. It suffices if the buyer alleges and proves such a defect exists. Lee v. Blanchard, above, and cases cited therein. In such instances, the buyer need only establish that the thing failed, under normal usage conditions, to perform as intended. Lee v. Blanchard, above, and numerous cases cited therein.
To avoid a sale for redhibition, the buyer must establish that the defect existed at the time of sale. If the vice is manifest within three days of the sale, it is presumed to have existed before the sale, and the burden then shifts to the seller to prove the contrary. LSA-C.C. art. 2530.
A redhibitory action may not be maintained unless the buyer is in a position to maintain the seller in the status quo, that is, to return the thing sold in the same condition as it existed at the time of sale. Johnson v. Parson Motors, Inc., La.App., 231 So.2d 73.
The sale of machinery or equipment will not be rescinded for redhibitory defects where the cause of failure is shown to be abuse, neglect, or improper use or maintenance thereof. Ditta v. Polk, La. App., 196 So.2d 672; Peters v. Pattison Pontiac Co., La.App., 259 So.2d 99.
Boyce contends the trial court erred in: (1) Finding that plaintiff proved the alleged defects appeared within three days of sale; (2) Holding that the cause of engine overheating was inherent defects and not improper use and maintenance; (3) Ordering rescission of the sale and return of the purchase price, and (4) Alternatively, ordering return of the purchase price instead of limiting plaintiff to a reduction in price because plaintiff had extensive repairs made to the tractor by a third party and was therefore unable to return the machine in the same condition it was at the time of sale.
The tractor had been previously owned by Luke Grizzaffi, who resold it to Boyce several months before Appellees acquired it from Boyce on June 10, 1968, for the sum of $32,100.00 cash. Before its sale to Appellees, one of Boyce's officers used the machine on his farm or estate during the winter of 1967-1968. An employee of the officer drained the machine of water during *822 a freeze, and inadvertently ran the tractor without water, cracking its cylinder heads. The machine was taken to Boyce's shop where it was repaired and checked on an adjacent proving ground and found to be in proper operating order. Thereafter it was sold by Boyce's salesman, Leon F. Hill, to Appellees, sight unseen. It is undisputed that Appellees bought the machine after informing Hill they intended to use it in a partnership venture for mutual profit in land clearing operations for third parties, including the removal of trees and stumps. Because of its intended use, Boyce made certain alterations or improvements to the tractor, including, inter alia, installation of side screens to protect the radiator from trees and brush, and a shield or screen to protect the driver from trees and limbs. Additionally, it was equipped with a cutting blade. The machine was sold with a warranty of 250 hours operation or 90 days, whichever lasted longer.
The record discloses that Appellees each own a Caterpillar D-6 (D-6), a smaller machine than a D-7E, which Appellees intended to use in conjunction with the D-7E. Both type machines can be and are used in the removal of trees and stumps, but the D-7E, being heavier and more powerful, is capable of downing larger trees and removing bigger stumps. Appellees intended to use the D-7E in removing larger trees and the smaller D-6 in removing small trees and brush, and in piling downed trees and uprooted stumps and the moving of dirt when required. It is further shown that LaFleur is a knowledgeable tractor operator with experience in operating both D-7Es and D-6s. It also appears that Appellees' operators are all experienced in the operation and maintenance of D-6s, and one of said operators, Isom Odom, had experience in operating a D-7, which is a larger machine than a D-7E.
Commencing with its first trial use by LaFleur on the afternoon of its purchase, the tractor overheated and could not be operated for sustained periods. The record discloses that the machine would overheat after one to two hours operation. When this occurred, it became necessary to let the machine idle from twenty to thirty minutes in order to cool before it could resume the work of land clearing. It is conceded by all concerned that this condition rendered the tractor unfit for its intended purpose. Appellees contend the condition resulted from a defect in the machine. Boyce claims the condition resulted from lack of proper maintenance, namely, failure of Appellees to keep the radiator grill and protective screens free of leaves and trash thus shutting off adequate air flow required to cool the engine during operation.
We find no merit in Boyce's contention that the defect did not manifest itself within three days of the sale. In this regard, Boyce relies principally upon hour meter readings recorded by its employees during numerous service calls made on the tractor after the sale. It is contended that the number of hours logged on the machine refute the contention it could not be operated without undue cooling off time. It is also contended the first complaint of overheating appears on its service report on July 31, 1968, at which time the tractor had logged 187 hours of operation, and had been in Appellee's possession more than a month. Boyce also relies on the testimony of Luke Grizzaffi, former owner of the tractor, who testified in effect that he had not had any insolvable problem with the tractor which he considered to be in reasonably good condition at the time he sold it to Appellant.
LaFleur, an experienced tractor operator, testified that on the evening of delivery, he attempted to use the machine to clear some trees, and after about two hours operation, it ran hot. He checked the radiator and found it full of water. He then cooled the tractor by letting it sit and run at idle speed. It again overheated after a short period of operation. LaFleur also stated a normal working day lasted 10 to 12 hours. According to LaFleur, when he attempted to use the tractor the morning following its purchase, after a short use, a *823 limb went through the radiator. This incident was reported to Ogden Abshire, Manager of Boyce's Lake Charles office, who sent a mechanic out with a new radiator. Boyce's reports, which are dated on completion of a repair job, regardless of the date on which commenced and the time taken to accomplish, show the repairs were completed June 21, 1968, at which time the hour meter indicated 38 hours use. Boyce claims this shows the machine was used more than the few hours indicated by LaFleur when the limb damage occurred to the radiator. It does not appear whether the meter was set at zero hours when the machine was delivered. In this regard, Boyce's Sales Manager, Hugh Palmer, testified it is possible for a mechanic to misread a meter, and that Palmer himself had on occasion done so.
LaFleur also testified that when the radiator was removed, it was discovered that a universal joint located beneath the radiator needed replacing. This repair was accomplished at the same time the radiator was fixed. Boyce contends the universal joint was repaired, according to its reports, on June 25, 1968, which report shows the work was performed at Basile, Louisiana, at which time the hour meter showed 107 hours of use. The record, however, contains another service report indicating the universal joint was replaced June 17, 1968, at Ville Platte, Louisiana. The reports are, to say the least, confusing. It would appear the June 17th report confirms LaFleur's testimony that this repair was done at the same time the radiator was repaired. Assuming the meter readings were correct, if the tractor worked June 22, 23 and 24, following its repair on June 21st, and before the repairs made June 25th, a period of three days during which it logged a total of 69 hours, it would mean the machine operated 23 hours daily. Such use is highly unlikely. Under the circumstances, we place little reliance upon the meter readings. A service report dated July 11, 1968, shows a meter reading of 187 hours, and that the winch on the machine was checked. On July 31, 1968, Boyce's employees repaired the tractor's winch and checked the engine for overheating. At this time, the report again shows a meter reading of 187 hours, indicating no use since July 11, 1968. If the readings of June 25, July 11, and July 31, 1968, are accurate, it indicates a use of 80 hours during the 16 days between June 25th and July 11th, and no operation whatsoever between July 11th and July 31st. It seems clear from the record that of the hours logged between date of acquisition and July 31st, a considerable portion thereof was in idle time to permit cooling of the engine.
We find the record establishes that the defect of overheating occurred within three days of the sale as attested by LaFleur who also stated he made repeated complaints about the overheating to defendant. He was not certain when he first complained, but believed it to be around June 21, 1968, when the damaged radiator was repaired. Boyce's salesman, Hill, conceded numerous complaints were made to him about the machine overheating. Although he was not certain as to the date of the first complaint, he believed it to be within about two weeks of the time the radiator was damaged. We note that the record conclusively establishes that Boyce's employees did not keep records of complaints unless a service man was sent to investigate, and a service report was made of the action taken thereon. We find that the first reporting of an overheating problem, appearing on Boyce's records as of June 31, 1968, is of little or no significance.
Boyce's records show the machine was first checked for overheating on July 31, 1968. Kermit Pitre, Boyce's mechanic, found the problem to be due to leaves and dirt on the radiator guards and insufficient water in the radiator. He did not clean the radiator because the work was performed at LaFleur's place, and no air compressor was available. Pitre stated he informed LaFleur about the condition of the radiator, which LaFleur denied. Pitre *824 again checked the tractor for overheating on August 9, 1968, at which time the hour meter showed 195 hours or 8 hours use since the prior checking for the same problem. This time Pitre attributed the problem to the setting of the idle R P M, and the position of the fuel oil racks, and made indicated adjustments. He made no mention of a clogged radiator. Testing of the tractor produced no overheating. On August 26, 1968, Pitre again checked the machine for overheating. The tractor was brought to Boyce's shops and the heads reconditioned. The radiator was not examined, neither was it cleaned while the tractor was in the shop. After completion of the repairs, the machine was tested and did not overheat. On August 28, 1968, Pitre again checked the tractor for overheating. He found air bubbles in the radiator to be the cause of the problem. He was of the opinion a head had probably cracked.
At this point plaintiffs tendered the machine to defendant, which offer was declined. On September 13, 1968, the machine was checked by defendant's employee, Harold Shelton, who found both cylinder heads cracked, and also discovered that the water regulators were not opening properly. Although he also found the radiator and side screens plugged up with leaves, he did not testify that this condition caused the trouble. He removed and replaced both heads and installed new water regulators. In effect, he attributed the trouble to the fact that both heads were cracked where they had been remolded by defendant. We find it significant that during the numerous repairs noted, on only one occasion was overheating attributed by Boyce to improper maintenance. Also significant is the fact that all of these repairs were performed by Boyce pursuant to its warranty, notwithstanding its claim the overheating was due to improper maintenance.
Boyce's claim that the difficulties experienced by Appellees resulted from improper care and maintenance of the tractor are not borne out by the record. Plaintiffs introduced in evidence a manufacturer's manual allegedly furnished by Boyce at the time of sale. The manual recommends cleaning dirt and trash from in between radiator tubes every 10 service hours by washing, blowing or brushing the dirt out by whichever means is available and proves most effective. Boyce produced the former owner, Grizzaffi, who stated in essence that when he used the machine, he had some difficulty with overheating due to trash and leaves clogging the radiator. He solved the problem by keeping on hand an air compressor with which the machine was cleaned an average of two to six times daily, or whatever number of times proved necessary depending upon the circumstances. He also testified that only a few minutes work time was lost during each cleaning operation.
In addition, Boyce's salesman, Hill, testified he informed LaFleur, within a week of the sale, that the radiator had to be kept clear of debris for the tractor to operate properly, and that he suggested that LaFleur obtain an air compressor to accompany the machine and clean it at least once a day. LaFleur emphatically denied being so advised. Defendant's mechanic, Pitre, also testified that he informed LaFleur the machine was overheating due to a clogged radiator, which LaFleur likewise denied.
Defendant's sales manager, Hugh Palmer, also deposed that proper maintenance requires a tractor's radiator be maintained free of dirt and trash, otherwise it will overheat. He suggested such could best be accomplished by having an air compressor or high pressure water system on the job to blow out the radiator and side screens at least twice daily. To Palmer's knowledge, two things could cause overheating, namely, insufficient water in the radiator, and obstruction of the cooling system either inside or out. He conceded Boyce never dismantled the tractor's engine to check for a possible internal obstruction.
John H. Reynolds, Boyce's used equipment manager, testified substantially to the *825 same effect, and added that at the time of purchase, he instructed Hill to inform the purchaser an air compressor would be needed to keep the machine clean if it was used in land clearing. Reynolds was not certain Hill communicated this message to plaintiffs, but believes that Hill did so inform LaFleur within a few days of the sale. He also stated that on one occasion, he personally told LaFleur an air compressor would be vital if the tractor was used in heavy land clearing.
Defendant also produced Ogden Abshire, service manager of defendant's Lake Charles, Louisiana establishment. Abshire stated that proper maintenance on D-6 tractors and D-7Es is essentially the same. He recalled discussing with LeFleur on three or four occasions the matter of overheating. He recalled suggesting that screens be installed on top of the tractor in addition to the side screens, which suggestion Abshire made on Reynolds' recommendation. He admitted this was the first and only time he made such a recommendation. Abshire admitted that many conditions can cause overheating besides an unclean radiator. He mentioned, among such other causes, insufficient water in the radiator, obstruction inside the engine block or head, fan belt slippage, torque converter malfunction, thermostat failure, failure of the radiator cap to seal causing loss of pressure, any other condition causing a loss of seal or pressure maintenance, and a cracked sleeve.
LaFleur supervised operation of the machine after its acquisition. He testified that essentially the same maintenance procedures were followed with respect to subject tractor as was employed on his personally owned D-6. He noted that on an average of once daily, the radiator and screens were brushed clean with a broom. He also testified to occasional cleaning with an air pressure hose located at his father's nearby service station. He further stated he had operated other D-7Es, following basically the same operating and maintenance policies, and never experienced any difficulty whatsoever. In ten years experience, five involving land clearing, he never had similar problems with either D-6 or D-7Es, despite his not having an air compressor on the job. His usual practice was to clean radiators about once daily. He operated subject tractor along with the D-6s owned by himself and Fontenot individually, and noted that he took even better care of subject machine in an attempt to stop its overheating.
Isom Odom, LaFleur's employee, had 16 years experience as an operator. He stated that during his years of operating tractors similar to subject machine, he never experienced an overheating problem similar to that he encountered with the machine in question. He stated the machine would overheat after about 3 hours operation, and required about 30 minutes cooling off time. He estimated he put in about 6 hours daily work time with subject machine, the rest of the day being spent in cooling it off. He corroborated LaFleur's testimony regarding use of air pressure at LaFleur's father's service station to clean the tractor on occasions. He also testified that once daily, in the morning, the tractor's radiator screens were cleaned with water pressure supplied by a gas pump using water from a canal at the job site.
LaFluer delivered the machine to Fontenot in or about March, 1969, stating that he could not successfully use it in performing clearing work. From this time on, the machine was placed under the supervision of Fonenot's employee, Ray Guillory, who stated the machine ran hot from his first attempted use. He testified that on Fontenot's individually owned D-6 and the D-7E, oil, grease and air filters were checked each day. The radiators were checked periodically during the day, but were not cleaned daily unless the machines were operated under dusty or leafy conditions such as land clearing, in which event the radiators might be cleaned daily. Ordinarily, however, the radiators were washed or blown clean every third work day, a water pressure pump and air compressor being *826 available for that purpose. As an extra precaution, the radiator of subject tractor was washed each night at quitting time, but this did no appreciable good. He stated he paid particular attention to cleaning the D-7E, but that it ran hot even when clean. He explained that cleaning while the machine was in operation consisted of brushing the leaves away by hand which occurred from 5 to 10 times daily. The reason water and air pressure were not used on the job was that leaves, dirt and debris collected on the outside of the screens which would require blowing from inside to remove such matter. Guillory stated he had never worked on a project where an air compressor was kept on the jobsite. He stated that some of the things done by the numerous mechanics who worked on the tractor were checking the water pump, inspecting the fan belt for slippage, replacing the torque converter, replacing the thermostats, running the machine without thermostats, checking water pressure in the radiator, checking to see if enough air was flowing through the radiator, pumping additional air into the radiator to increase pressure, and installing additional screens recommended by Boyce to replace a section of the tractor's hood to permit a greater flow of air. Guillory also stated that at no time during the numerous checks for overheating did anyone suggest the cause of overheating was lack of or improper maintenance.
We find the evidence establishes the degree of care ordinarily exercised in the operation of a D-6 and D-7E tractor are essentially the same. We are also impressed by the uncontroverted testimony that subject machine was operated alongside the D-6s owned and operated by plaintiffs and received at least as good care and maintenance as did the slightly smaller tractors, which latter machines gave plaintiffs no trouble whatsoever. LaFleur, Odom and Guillory, all experienced operators, testified they undertook extra precautions with the larger machine because of the problems noted. Based on the evidence detailed, we conclude that the record does not support Appellant's contention that the defect of overheating resulted from improper maintenance or abuse on plaintiffs' part. On the contrary, we conclude the record shows that the purchasers did in fact properly care for and maintain the tractor, and that the defect repeatedly manifested itself under normal conditions of use, operation and maintenance.
Testimony was taken in this matter in February, 1971. Judgment was rendered herein in December, 1972. Because of the time lapse involved, counsel for Boyce contends the manifest error rule should not apply, citing Ellis v. Kolb, La.App., 196 So. 89; Smith v. Tri-State Transit Co. of Louisiana, La.App., 175 So. 83; Smythe v. Great American Indemnity Co., La.App., 35 So.2d 267. It is unnecessary to comment on this argument except to say that, in this instance, we do not rely upon the manifest error rule, but reach our conclusions of fact herein upon our own independent perusal and consideration of the record.
We next consider Appellant's contention that rescission should be denied because Appellees had extensive repairs made to the tractor by a third party. Following Appellees' second tender to Appellant by letter dated October 29, 1968, Appellees had repairs performed on the machine by Louisiana Machinery Company, Inc. The records of said concern show that on November 21, 1968, the governor was replaced. It appears that LaFleur had the work done by Louisiana Machinery because Boyce refused to make further service calls pursuant to its warranty. On November 7, 1969, after institution of this action, Appellees had Louisiana Machinery perform a complete overhaul of the tractor's motor and cooling system, including reconditioning both cylinder heads, at a cost in excess of $3,000.00. Under the circumstances, rescission may not be allowed because the purchaser is incapable of restoring the machine to the seller in the *827 same condition as it existed at the time of sale. In Johnson v. H. W. Parson Motors, Inc., La.App., 231 So.2d 73, rescission was denied, and the purchaser limited to recovery of part of the purchase price because extensive repairs to the automobile involved had been performed by a third party. The rule in Johnson, above, is peculiarly applicable here.
Since it is impossible from the record for this court to assess the amount of reduction in price due Appellees, it is necessary that this matter be remanded to the trial court for determination of this issue.
We find plaintiffs' claims for damages in the form of alleged lost profits, and attorney's fees, were properly denied by the trial court. The contention is made that since Boyce restored the tractor before selling it to plaintiffs, Boyce is in the same position as an artisan, craftsman, builder or manufacturer who is presumed to know the defects of his products, and who is answerable to a purchaser for damages and attorney's fees sustained because of defects in the thing sold as provided in LSA-C.C. art. 2545. The rule invoked by Appellees is inapplicable herein inasmuch as Boyce was not the manufacturer of the tractor. A similar contention was made and judicially rejected in Compte v. Rateau, La.App., 242 So.2d 82, which involved the sale of a used automobile to which the purchaser had extensive repairs made by a third party. Under the circumstances, Boyce is not presumed to know of defects in the tractor. Neither does the record establish actual knowledge of defects on Boyce's part.
It is ordered, adjudged and decreed that the judgment of the trial court ordering rescission of the sale of a D-7E Caterpillar Tractor by defendant, Boyce Machinery Corporation, to plaintiffs, Roger LaFleur and Percy Fontenot, and awarding said plaintiffs judgment against defendant in the sum of $32,130.00, is reversed and set aside.
It is further ordered, adjudged and decreed that judgment be and the same is rendered herein in favor of plaintiffs and against defendant ordering a reduction in the purchase price of subject machine for defects rendering same unfit for its intended purpose, and this cause remanded to the trial court for determination of the amount of such reduction.
In all other respects, the judgment of the trial court is affirmed at the cost of Appellant, Boyce Machinery Corporation.
Affirmed in part, reversed in part, and remanded.